UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ERROL TYLER, ALLENA TABB-HARPER, NAUTICAL TOURS, INC.,

Plaintiffs,

v.

GREGORY LONG, in his official capacity as Acting Commissioner of Boston Police,[1] and THOMAS LEMA, individually and in his official capacity as Inspector of Carriages, Hackney Carriage Unit,

Defendants.

Civil Action No. 1:18-cv-10677-IT

MEMORANDUM & ORDER

May 31, 2022

TALWANI, D.J.

This case stems from the attempts of Plaintiffs Nautical Tours, Inc., and its principals, Erroll Tyler and Allena Tabb-Harper (collectively, "Nautical Tours"), to operate sightseeing tours in Boston. Nautical Tours brought this action against the Boston police commissioner in his official capacity and Thomas Lema, the inspector of carriages, individually and in his official capacity, claiming that these city officials violated Nautical Tours' constitutional rights to due process and equal protection by failing to grant a sightseeing vehicle license. The parties filed cross-motions for summary judgment. For the following reasons, the city officials' Motion for Summary Judgment [Doc. No. 106] is GRANTED, and Nautical Tours' Motion for Summary Judgment [Doc. No. 109] is DENIED as moot.

[1] Pursuant to Fed. R. Civ. P. 25(d), Acting Commissioner Long has been substituted for former Commissioner William Gross.

## I. Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Baker v. St. Paul Travelers, Inc., 670 F.3d 119, 125 (1st Cir. 2012). A dispute is genuine if a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This burden can be satisfied in two ways: (1) by submitting affirmative evidence that negates an essential element of the non-moving party's claim or (2) by demonstrating that the non-moving party failed to establish an essential element of its claim. Id. at 331.

Once the moving party establishes the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to set forth facts demonstrating that a genuine dispute of material fact remains. Id. at 314. The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of [the] pleadings." Anderson, 477 U.S. at 256. Rather, the non-moving party must "go beyond the pleadings and by [his or] her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). Disputes over facts "that are irrelevant or unnecessary" will not preclude summary judgment. Anderson, 477 U.S. at 248.

When reviewing a motion for summary judgment, the court must take all properly supported evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." Anderson, 477 U.S. at 255.

The fact that the parties have filed cross motions does not alter these general standards; rather the court reviews each party's motion independently, viewing the facts and drawing inferences as required by the applicable standard, and determines, for each side, the appropriate ruling. See Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996) (noting that cross-motions for summary judgment do not "alter the basic Rule 56 standard" but rather require the court "to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed").

## II. City Officials' Motion for Summary Judgment

### A. *Factual Background*

#### 1. Nautical Tours' Initial Efforts to Operate Sightseeing Tours, and Boston's Sightseeing Vehicle Licensing Moratorium

Nautical Tours is a Massachusetts corporation owned and operated by Tyler and Tabb-Harper, who serve as its president and vice president, respectively. Pls' Statement of Material Facts ("Pl's SOF Resp.") ¶ 41 [Doc. No. 118]. Tyler is African American. Id. at ¶ 40. Nautical Tours has sought to operate sightseeing tours in Boston using amphibious vehicles since 2003. Id. at ¶ 42.

In Boston, sightseeing tour operators must obtain a sightseeing vehicle license. 1930 Mass. Acts ch. 392, § 1. The Boston police commissioner has exclusive authority over the

licensing of sightseeing vehicles. 1931 Mass. Acts ch. 399, § 3, as amended by, 1933 Mass. Acts ch. 93.

Beginning in June 1998, only a handful of sightseeing tour companies were granted sightseeing vehicle licenses to operate in Boston. Pls' SOF Resp. ¶¶ 10-21 [Doc. No. 118]. These companies were allowed to request new licenses for vehicles they intended to add to their fleet, as long as the total number of vehicles licensed did not increase. Id. at ¶ 19. They could also obtain provisional licenses for vehicles that they did not yet own. Id. at ¶ 20. No other companies were able to apply for a sightseeing vehicle license. Id. at ¶ 21.

In 2006, Nautical Tours sought a municipal street license from Cambridge. Tyler Depo. 52-56 [Doc. No. 111-1].[2] Cambridge denied the license, and Nautical Tours appealed to the DPU. Id. In 2007, the DPU

> concluded that Nautical Tours had not met its burden of demonstrating that it was able to operate its proposed plan, because it could not demonstrate that it had secured adequate financing. To facilitate Nautical Tours' ability to obtain financing, the department, among other things, issued to Nautical Tours a conditional certificate of public convenience and necessity in accordance with [Mass. Gen. Laws ch.] 159A, § 7, which required Nautical Tours either to obtain from the Boston police commissioner a sightseeing license in accordance with [1931 Mass. Acts ch. 399] or to obtain a waiver of the sightseeing license and to obtain a municipal street license under [Mass. Gen. Laws ch.] 159A, § 1.

Nautical Tours, Inc. v. Dep't of Pub. Utilities, 469 Mass. 1007, 1007, 14 N.E.3d 314 (2014) (internal citations omitted). Nautical Tours did not appeal the 2007 order.

---

[2] Generally, a municipal street license is needed to carry passengers for hire on the public ways of cities and towns in the Commonwealth. Mass. Gen. Laws ch. 159, § 1. These may be issued by a local licensing authority, or if the local licensing authority denies or fails to act on a municipal street license application, by the state department of public utilities ("DPU"). Id.

2. Nautical Tours' First Federal Lawsuit, and Boston's Lifting of the Moratorium and Promulgation of New Requirements

On February 18, 2009, Tyler sued Boston, claiming that Boston's moratorium on new licenses violated his constitutional rights. Pls' SOF Resp. ¶ 11 [Doc. No. 118]; see also Compl., Tyler et al. v. City of Boston, et al., No. 09-cv-10235 (D. Mass. Feb. 18, 2009).

On September 29, 2009, the commissioner and the mayor announced by letter that Boston was lifting the moratorium and would immediately begin accepting applications for the 2010 season, which began March 1, 2010. 09/29/2009 BPD Letter 7 [Doc. No. 108-1]. The letter also notified potential applicants that the Boston police department had been revising its licensing rules and that applications would be reviewed under the new rule. Id.

In conjunction with drafting the new rule, Captain Robert Ciccolo, the head of the licensing division, created two application forms, one for "new companies" and a renewal form for "existing companies." Defs' SOF ¶¶ 13-14 [Doc. No. 108]; Pl's SOF Resp. ¶ 33 [Doc. No. 118]; Ciccolo Aff. ¶ 4. The new company application included the words "NEW COMPANY" in the document header as early as the 2010-2011 season and required an applicant to supply the social security numbers of each of several corporate officers. Defs' SOF ¶¶ 15, 21 [Doc. No. 108]; Pl's SOF Resp. ¶¶ 34-35 [Doc. No. 118]; see New Company Application 5 [Doc. No. 108-1]. The renewal application did not require an applicant to provide social security numbers, and when originally created (and through the 2014-2015 application) did not include "EXISTING COMPANY" or any similar information in the header. Compare 2014-2015 Boston Duck Tour App. with 2015-2016 Boston Duck Tour App. [Doc. No. 108-14].[3]

---

[3] The city officials contend that Tyler was aware of the new company application as of October 2009, where a Boston police department official emailed a copy to Christina Mulligan, Tyler's counsel in the first federal case. See Defs' Mem. 2 [Doc. No. 107]; 10/1/2009 Ciccolo Email 4-6 [Doc. No. 108-1]. However, Tyler contends that Mulligan did not forward the form to him,

On January 5, 2010, the commissioner promulgated Boston Police Department Rules and Procedures, Rule 404 ("Rule 404") to govern the issuance of sightseeing vehicle licenses. Rule 404 [Doc. No. 108-2]. Rule 404 delegates the review and processing of sightseeing vehicle licenses to the inspector of carriages in the hackney carriage unit. Id. § 1.6. However, the commissioner of the Boston police department retains final decision-making authority on the license applications and decides final appeals from denials of any applications. Id. §§ 1.5, 5.6.

The rule distinguishes between new applications and renewals. Id. Renewals must be filed annually before February 1, while new applications may be filed with the inspector of carriages at any time. Id. Rule 404 lists what documents an applicant must submit to the inspector of carriages in support of the applications, including an application "on such forms and with such information as the Inspector of Carriages shall require," and states that the commissioner "reserves the right to require copies of such other documents, permits, licenses or certificates as he/she may determine necessary during the license application review process." Id. §§ 2.4.1, 2.4.2. The rule also allows the commissioner to deny an application "for any reason." Id. § 3.1.11.

Nautical Tours did not apply for a sightseeing vehicle license at this time but did dismiss the federal court action challenging the moratorium. Stipulation of Dismissal, Tyler et al. v. City of Boston, et al., No. 09-cv-10235 (D. Mass. Sept. 3, 2010) ECF No. 51.

---

Second Aff. ¶ 21 [Doc. No. 117], and for purposes of summary judgment, the court accepts that Tyler did not receive a copy of the new form in 2009.

3. Nautical Tours' Efforts to Secure a Municipal Street License

In 2010, Nautical Tours applied instead to the Boston city council for a municipal street license in Boston.[4] Nautical Tours, 469 Mass. at 1007; Pl's SOF Resp. ¶ 43 [Doc. No. 118]. The city council did not respond to the application within sixty days, so Nautical Tours appealed to the DPU. Nautical Tours, 469 Mass. at 1008. The DPU found that it lacked jurisdiction to issue a license for Boston, where, as described above, the Legislature had created a separate licensing scheme for Boston and vested exclusive authority to license sightseeing vehicles in the commissioner. Pl's SOF Resp. ¶ 43 [Doc. No. 118]. Nautical Tours appealed, and the Massachusetts Supreme Judicial Court ("SJC") ultimately upheld the DPU's determination on August 20, 2014. Id. at ¶¶ 44-45. The SJC noted, however, that Nautical Tours was not without recourse, as it could apply for a sightseeing vehicle license under Rule 404. Id. at ¶ 45. The SJC noted further that if Nautical Tours received an unfavorable decision from the Boston police commissioner, it could seek judicial review. Nautical Tours, 469 Mass. at 1010.

4. Nautical Tours' Subsequent Efforts to Secure Sightseeing Vehicle Licenses

For the next eight months after the SJC's decision, Tyler made numerous attempts to obtain the sightseeing vehicle license application form but was given various excuses by hackney carriage unit officials for why the forms were unavailable. First Aff. ¶¶ 29-31 [Doc. No. 111-4]. In early April 2015, Tyler visited the Boston police department headquarters and spoke with Juliana Susi, the office manager of the hackney carriage unit. Id. at ¶¶ 36-37. Susi gave him nine copies of the renewal application for the 2014-2015 season (which had already ended as of

---

[4] In his Second Affidavit ¶¶ 19-20 [Doc. No. 117], Tyler states that he applied for a municipal street license rather than a sightseeing license on the advice of an official in the hackney carriage unit.

March 1, 2015). Id. at ¶ 42. As discussed above, the 2014-2015 renewal application did not include the words "EXISTING COMPANY" or any similar information in the header.

On April 10, 2015, Nautical Tours submitted nine sightseeing vehicle applications to the Boston police department on the 2014-2015 renewal form (the "April 2015 applications"). Pl's SOF Resp. ¶ 46 [Doc. No. 118]. Nautical Tours also submitted evidence that its tour routes had been approved by the Boston transportation department ("BTD") in 2010. Id. at ¶ 53. Over the next several months, Nautical Tours repeatedly asked the city to act on the April 2015 applications with no success. Id. at ¶¶ 51-54.

Around June 10, 2015, Tyler spoke with Susi, who told him that he would need to obtain an updated tour route from the BTD. See Tyler Depo. 141-48 [Doc. No. 111-1]; Nautical Tours Exs. 66 [Doc. No. 120-1]. On June 17, Tyler and Tabb-Harper went to the office of the BTD and were told by BTD officials that there was no time limits on approved tour routes and that the officials were unaware of an annual renewal or reapproval policy. First Aff. ¶¶ 63-64 [Doc. No. 111-4].

Also on June 17, 2015, Tyler submitted a request for an appeal hearing where Lema, as the inspector of carriages, had not acted on the April 2015 applications within sixty days. First Aff. ¶¶ 29-31 [Doc. No. 111-4]; Nautical Tours Exs. 61 [Doc. No. 120-1]. On June 22, Tyler visited the hackney carriage unit and spoke with Lema and Susi. First Aff. ¶ 67 [Doc. No. 111-4]. During that meeting, Susi told Tyler that she needed Nautical Tours to submit the names, dates of birth, and social security numbers of its corporate officers so that she could run a background check. Id. at ¶ 74. Tyler asked Lema whether Rule 404 had been amended to add that requirement and explained that he felt uncomfortable providing that information. Id. at

¶¶ 73-77. Lema said that he would look into the matter and call Tyler the next day but he never called. Id. at ¶¶ 82-83.

Two days later, Tyler returned to the hackney carriage unit and asked to speak with Lema. Id. at ¶ 86. At some point, a Boston police officer handed Tyler two applications. Id. at ¶¶ 90-94. The applications were a renewal application and a new company application, both of which differed from the applications he had been given by Susi in April 2015 in that (1) the 2015-2016 renewal application included the words "EXISTING COMPANY" and the 2015-2016 new company application included the words "NEW COMPANY" in the header, and (2) the new company application requested the names, dates of birth, and social security numbers of the corporation's officers. Id. at ¶¶ 95-97, 110-12. Nautical Tours declined to complete the new form and, instead, renewed its request that the city act on its April 2015 applications. Pl's SOF Resp. ¶ 57 [Doc. No. 118].

On June 24, Tyler wrote a letter to the BTD seeking clarification regarding the policy on tour route approvals. Nautical Tours Exs. 74 [Doc. No. 120-1]. He had a conversation with BTD employees on August 4, id. at 80, 86, and was told by the director of planning that all previously approved BTD sightseeing tour routes needed to be reapproved annually, id. at 80. So, the next day, he wrote a letter to the commissioner of the BTD, attaching Nautical Tours' prior route approval documents, requesting that it be considered as a reapproval application. Id. After receiving no response from the BTD, Tyler followed up by letter dated September 23, 2015, requesting that the route be reapproved. Id. at 86. Tyler sent a subsequent letter on March 14, 2016, requesting that BTD reapprove Nautical Tours' sightseeing routes for the 2016-2017 season. Id. at 93. There is no evidence in the record that the BTD ever acted on or responded to any of Tyler's requests.

Over the next several years, Nautical Tours asked the hackney carriage unit and Lema numerous times to act on the April 2015 applications. Id. at ¶ 62. At no point did Nautical Tours fill out the new company application. Tyler Depo. 236 [Doc. No. 111-1].

On April 6, 2018, Nautical Tours filed the instant action. Compl. [Doc. No. 1]. On October 30, 2019, after the court refused to dismiss Nautical Tours' claim that the city officials' failure to act on the April 2015 applications violated Nautical Tours' due process rights, Mem. & Order 11 [Doc. No. 50], Lema finally denied Nautical Tours' April 2015 applications as incomplete for failure to use the correct form and failure to present the vehicles for inspection. Denial of Apps. [Doc. No. 108-23]. The commissioner denied Nautical Tours' subsequent appeal. Denial of Appeal [Doc. No. 108-25].

B. *Discussion*

Nautical Tours brings four claims under 42 U.S.C. § 1983 for violations of procedural due process and equal protection. Two claims are against the commissioner and inspector of carriages in their official capacities (Count I (Due Process) and Count III (Equal Protection)), and the other two are against Lema in his individual capacity (Count II (Due Process) and Count IV (Equal Protection)). Am. Compl. [Doc. No. 46].

1. Procedural Due Process

To prove a procedural due process violation, a plaintiff must demonstrate (1) a deprivation of a protected interest and (2) that the deprivation was accomplished without due process of law. Perez–Acevedo v. Rivero–Cubano, 520 F.3d 26, 30 (1st Cir. 2008). The court previously determined that Nautical Tours lacked a protected property interest in a sightseeing vehicle license where the police commissioner has significant discretion in deciding whether to grant the licenses. Mem. & Order 11 [Doc. No. 50]. The court concluded, however, that Tyler and Tabb-Harper had a protected liberty interest in "the right to make a living in their chosen

profession for which the sought-after license is a prerequisite," and that Nautical Tours' Amended Complaint [Doc. No. 46] stated a claim for relief where the city officials' alleged failure to act on their applications deprived them of the right to judicial review of an adverse decision. Id.

At the hearing on the city officials' motion to dismiss, the city officials' counsel had argued that Nautical Tours' applications were incomplete, and therefore Lema was not required to act on them. The court rejected this argument, noting that on a motion to dismiss, the court views all well-pleaded facts in the light most favorable to the non-moving party, and Nautical Tours had alleged that the applications submitted were complete. Mem. & Order 10, n.4 [Doc. No. 50] (citing Am. Compl. ¶¶ 31, 35-37, 43-47, 50-55 [Doc. No. 46]).

The inquiry on summary judgment is different. As described above, the record establishes that Nautical Tours submitted the applications for the 2015-2016 season on a 2014-2015 form. Nautical Tours also does not dispute that it received the new application form for 2015-2016 in June 2015 but never filled out those application. On this record, Nautical Tours was not deprived of any process due where it did not submit a completed application on the correct form.

In any event, even if the court were to conclude that the city's failure to formally deny the April 2015 applications violated Nautical Tours' right to due process, the remedy would be limited to a court order to the city officials to issue a decision on the applications. See Carey v. Piphus, 435 U.S. 247, 264-65 (1978) (holding that proper remedy for violation of procedural due process is assessed by measuring remedy sought against nature of interest protected). Where Nautical Tours has now received that decision, the court is unable to provide further relief.

2. Equal Protection

Nautical Tours also brings claims for violation of equal protection where the city officials (1) failed to process Nautical Tours' sightseeing vehicle applications in a timely fashion while

processing existing company applications without incident and (2) required the corporate officers' social security numbers, which were not requested of existing company officers.

"Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage," rational basis review applies. City of New Orleans v. Dukes, 427 U.S. 297, 303 (1976). A law passes rational basis scrutiny if it is "rationally related to a legitimate state interest." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440 (1985). To establish a "class of one" equal protection claim, a plaintiff must demonstrate that he or she has been intentionally treated differently from other persons who are "similarly situated," and that there is "no rational basis" for this disparate treatment. Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000). The existence of a comparator is an essential element of such a claim, and plaintiffs must demonstrate an "extremely high degree of similarity between themselves and the persons to whom they compare themselves." Snyder v. Gaudet, 756 F.3d 30, 34 (1st Cir. 2014) (quoting Cordi-Allen v. Conlon, 494 F.3d 245, 250 (1st Cir. 2007)). "To determine whether two or more entities are 'similarly situated,' [the court] ask[s] 'whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated.'" SBT Holdings, LLC v. Town of Westminster, 547 F.3d 28, 34 (1st Cir. 2008) (quoting Barrington Cove Ltd. P'ship v. Rhode Island Hous. & Mortg. Fin. Corp., 246 F.3d 1, 8 (1st Cir. 2001)).

The record evidence demonstrates that as early as October 2009, there were different new company and renewal applications, although the latter did not include the words "EXISTING COMPANY" until the 2015-2016 season. From its creation in 2009 for the 2010-2011 season, the new company application required the president, vice president, secretary, and treasurer of the company seeking the sightseeing license to provide their names, dates of birth, and social

security numbers, among other things. 2010-2011 New Company App. [Doc. No. 108-1]. The renewal application did not require that information.

Nautical Tours argues that the city has not offered any rational reason why it treated new and existing companies differently. But as to the social security numbers, the city has explained that it used them to run background checks and has provided evidence that it was in fact doing so in April 2015. See 04/01/2015 Susi & Lema Email Exchange [Doc. No. 108-11] (Susi informing Lema that she would run background checks after receiving Trail Blazer Tours' application). The city officials state further that new companies were treated differently from existing companies because the existing companies had been doing business in Boston since before the moratorium was enacted in 1998 and therefore had a long track record with the Boston police department.

Regarding the timeline in processing applications, the city has similarly explained that it had a rational reason for treating Nautical Tours' applications differently from existing company applications where Nautical Tours was asked to fill out the new company application and refused to do so. It has also provided evidence that where new companies filed the correct application after the moratorium ended, those applications were duly processed. Nautical Tours was the only new company that declined to fill out a new company application.

"An equal protection claim will only succeed if the decision to treat an individual differently than those similarly situated is wholly 'arbitrary or irrational.'" Wojcik v. Massachusetts State Lottery Comm'n, 300 F.3d 92, 104 (1st Cir. 2002) (quoting Me. Cent. R.R. Co. v. Bhd. of Maint. Way Employees, 813 F.2d 484, 492 (1st Cir. 1987)). In this case, Nautical Tours has not identified specific evidence concerning similarly situated individuals or companies—those that did not have a preexisting relationship with the city—who received different treatment. Nautical Tours points only to the differences in treatment between new

companies and existing companies, which are not similarly situated. Nautical Tours' equal protection claims therefore fail.

In addition, Nautical Tours has not adduced evidence of an arbitrary or irrational motive for the city's different treatment of new companies. Although Nautical Tours may believe that this scheme makes little sense where the city requested social security numbers only for certain corporate officers, a classification "does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality," Heller v. Doe, 509 U.S. 312, 321 (1993) (quoting Dandridge v. Williams, 397 U.S. 471, 485 (1970)). And here, the city officials have articulated a rational explanation for treating existing companies differently from new companies—the existing companies already had a long-standing business relationship with the city.

There is some irony to Boston's insistence in maintaining different standards for companies with longstanding relationships with the city while at the same time proclaiming diversity goals and initiatives, such as its executive order "to reduce barriers and encourage more minority- and woman-owned businesses in Boston to compete for city contracts and procurements." Disparity Study Completed; Executive Order Signed, https://www.boston.gov/news/disparity-study-completed-executive-order-signed-establishing-goals-minority-and-woman-owned, accessed May 27, 2022. Perhaps city officials looking at this case would wonder why, if background checks make sense for licensing new businesses, they should not also be imposed on old businesses. Or, if backgrounds check are not needed for grandfathered entities, are they really needed for newcomers? Perhaps city officials should consider why they and their legal department are fighting to maintain two different standards, when a level playing field would seem to be a logical first step to addressing disparities.

Regardless, Boston's decision here to apply two different standards does not amount to a constitutional violation where the city officials have demonstrated a basis for the different standards that withstands rational basis scrutiny.

## III. Nautical Tours' Motion for Summary Judgment

Where the court concludes that the city officials are entitled to summary judgment on all claims, the court need not reach Nautical Tours' Motion for Summary Judgment [Doc. No. 109]. Accordingly, the motion is denied as moot.

## IV. Conclusion

For the foregoing reasons, the city officials' Motion for Summary Judgment [Doc. No. 106] is GRANTED, and Nautical Tours' Motion for Summary Judgment [Doc. No. 109] is DENIED as moot.

IT IS SO ORDERED.

May 31, 2022

/s/ Indira Talwani
United States District Judge